FRANK COOKE, INC. *vs.* ROBERT J. HURWITZ & another.

Worcester. March 12, 1980. — June 26, 1980.

Present: HALE, C.J., GRANT, & NOLAN, JJ.

*Limitations, Statute of. Accountant. Consumer Protection Act.*

In an action commenced in August, 1975, seeking damages from an accounting firm for losses sustained by the plaintiff as the result of alleged shortcomings in the investment advice and services rendered to the plaintiff by a member of the firm, claims in contract or tort were barred by the statutes of limitations in G. L. c. 260, §§ 2 and 2A, where it appeared that the plaintiff, in the exercise of reasonable diligence, should have known by early 1969 at the latest the facts giving rise to the claims; that the defendant did not affirmatively or intentionally conceal the causes of action; and that any fiduciary relationship between the parties ended in early 1969.  [106-109]

A cause of action alleging negligence on the part of the defendant with respect to investment advice and services rendered to the plaintiff was barred by G. L. c. 260, § 2A, where the plaintiff failed to prove that any of the losses resulting from its investments was sustained during but not before the two-year period immediately preceding the commencement of the action.  [109-110]

The plaintiff in an action for accounting malpractice failed to prove any damages resulting from the defendant's alleged failure to reflect on financial statements submitted to the plaintiff the doubtful collectibility of a loan where, at the time of the alleged failure to report relevant facts, the loan had already become worthless and thus there were no damages resulting from the alleged malpractice.  [110-111]

An action under G. L. c. 93A, § 11, arising out of investment advice and services rendered by a member of an accounting firm to the plaintiff, was properly dismissed where the plaintiff failed to prove that its losses resulted from any actions by the defendant.  [111-112]

CIVIL ACTION commenced in the Superior Court on August 5, 1975.

The case was heard by *O'Connor*, J.

*Philip G. Koenig* for the plaintiff.

*Erik Lund* for the defendants.

GRANT, J.  By this action commenced on August 5, 1975, the plaintiff seeks to shift to a firm of certified public accountants (accounting firm) the losses sustained by the plaintiff on certain investments made by it in 1967 and 1968 while acting on the advice of the defendant Hurwitz (defendant), a member of the accounting firm.  The amended complaint alleges negligence and breaches of contractual and fiduciary relationships on the part of the defendant and includes a claim under G. L. c. 93A, § 11.  The trial judge found for the defendants on all the counts of the complaint, and the plaintiff has appealed from the ensuing judgment of dismissal.  We affirm the judgment, although not for all the reasons relied on by the judge.  The following is a partial summary of the salient facts found by the judge and by us (see *Fales* v. *Glass*, 9 Mass. App. Ct. 570, 571 [1980], and cases cited) which are material to our disposition of the case.

The plaintiff is a corporation primarily engaged in the manufacture of optical equipment, with its principal place of business in North Brookfield.  The business was founded in 1945 by Frank Cooke, who was and is the plaintiff's president and the only person responsible for its management.  In 1960 the plaintiff, acting on the advice of a member of its regular law firm (law firm), retained the accounting firm to do the plaintiff's accounting work.  Substantially all that work was thereafter performed by or under the supervision of the defendant, who dealt directly with Cooke.

The defendant's services to the plaintiff were originally confined to accounting matters, but by the mid-1960's Cooke and the defendant had developed a close business relationship and the defendant's advice and services became more wide ranging.  At that time Cooke was sitting on the local advisory boards of two banks and had become aware of the substantial amounts which could be earned through investment of idle funds.  He expressed to the defendant his interest in investing a large sum belonging to the plaintiff which was not needed in its business and which was earning little or no return.  Cooke asked the defendant whether he could

suggest suitable areas of investment, and the defendant, who provided investment advice for a fee to other clients of the accounting firm, agreed to recommend investments which would be reasonably safe and profitable. At the outset the plaintiff's investment activities were limited to transactions in listed securities. The defendant would receive information and recommendations from a stockbroker with respect to investments in which the plaintiff might be interested; the defendant would decide what transactions ought to be recommended and would inform Cooke of his recommendations, sometimes forwarding written reports on the securities in question; and unless he objected to recommended purchases, Cooke would draw checks on the plaintiff's bank account to pay for the securities. Cooke rarely declined to follow the defendant's recommendation.

In 1966 the defendant advised Cooke that a local businessman in Worcester by the name of John R. Moynagh, Jr., was desirous of borrowing a substantial sum of money at an attractive rate of interest. The defendant told Cooke that Moynagh was his friend and client, that Moynagh ran a successful and profitable business, that he was well respected in the business community and had received substantial bank loans, but that he had reached his borrowing limits at the banks and was therefore looking for other sources of credit. The defendant expressed the opinions that Moynagh had sufficient collateral and that in view of the proposed rate of return a loan to Moynagh seemed to be the kind of investment in which Cooke was interested. As a result of their discussion the defendant arranged a $95,000 loan from the plaintiff to Moynagh and a business associate of the latter. The loan was repayable in ninety days, bore interest at the rate of twelve percent per annum and was secured by a pledge of shares of the capital stock of BSF Corporation (BSF). The loan was not repaid when due, but Cooke agreed to extend the time for payment and the loan was subsequently paid in full, with interest.

In 1967 the defendant learned that Moynagh was again in need of a loan. Moynagh held certain instalment notes of

D. H. Overmeyer Co., Inc. (Overmeyer), which that cor-
poration had issued to him in payment of a debt owed him
by a bankrupt subsidiary of Overmeyer. Moynagh was de-
sirous of raising some cash on the strength of the Overmeyer
notes and suggested to the defendant that Cooke might be
interested in making him a $57,000 loan which would be
secured by those notes. The defendant relayed the fore-
going information to Cooke, adding that Overmeyer was
one of the largest warehousing corporations in the country
and suggesting that a further loan to Moynagh might be
worthy of Cooke's consideration. Cooke decided to make
such a loan and asked the defendant what procedures would
be needed to effect it. The defendant advised him that the
loan should be evidenced by a note payable to the plaintiff
and that counsel should be retained to draft the necessary
documents. As Cooke was dissatisfied with the fees charged
by his regular law firm, the defendant undertook to select
someone else. He retained a Mr. Wolfson, with whom he
was acquainted and who had previously represented Moy-
nagh in various matters. Mr. Wolfson was retained solely
to prepare documents; he was given to understand that he
represented Moynagh and took no measure to protect the
plaintiff's interests. His fee was paid by Moynagh.

On April 25, 1967, the plaintiff made a $57,000 loan to
Moynagh which was evidenced by a note payable in month-
ly instalments, with interest at the rate of eleven percent per
annum on the unpaid balance. The note recited as security
four Overmeyer notes in the aggregate face amount of
$56,855.29 and mortgages said to secure those notes. The
defendant drafted and Moynagh executed a preliminary
assignment of the Overmeyer notes to the plaintiff; a few
days later Moynagh executed definitive assignments which
had been prepared by Mr. Wolfson. The defendant placed
the Moynagh note, the Overmeyer notes and the assign-
ments of the latter in the plaintiff's safe deposit box. The
mortgages referred to in the Moynagh note, if they ever ex-
isted, were never assigned to the plaintiff, and Overmeyer
was never notified that its notes had been assigned to the

plaintiff. Overmeyer continued to make payments to Moynagh on its notes, and Moynagh made instalment payments on his note to the plaintiff through October of 1967. Except for a partial payment in January of 1968, Moynagh made no further payment of principal or interest on the $57,000 note.

Late in 1967 Cooke told the defendant that he was interested in making further investments which would earn the plaintiff a rate of return comparable to that earned on the initial loan to Moynagh. The defendant agreed to inform Cooke if he should discover such an opportunity, and when Moynagh told the defendant of his need for a short term loan of $35,000, the defendant relayed that information to Cooke. The defendant informed Cooke that a piece of real estate owned by Moynagh was being taken by the Worcester Redevelopment Authority (WRA) and that Moynagh wanted a loan pending completion of the taking and payment therefor by the WRA. The possibility of obtaining a second mortgage on the real estate as security for the proposed loan was broached, but no such mortgage was actually executed or recorded until July of 1969.[1] A $35,000 loan was consummated on January 2, 1968, and was evidenced by a note prepared by the defendant and duly executed by Moynagh which was payable in 120 days, with interest at the rate of ten percent per annum. No payment was ever made on that note.

In early 1968 Cooke was contacted by an Assistant United States Attorney in Boston who was participating in a grand jury investigation into the affairs of one of the promoters of BSF and who asked Cooke for information as to the plaintiff's possible involvement in the affairs of that corporation, some of the shares of which had been pledged as collateral for the initial $95,000 loan to Moynagh and his business associate. Cooke, who at the time of making that loan had

---

[1] The judge's finding that "[o]riginally no security was contemplated by Hurwitz, Cooke or Moynagh" is contrary to considerable testimony, not supported by any evidence, and "clearly erroneous" within the meaning of Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). Just what those persons may originally have contemplated is unclear, but immaterial in the view we take of this case.

specifically inquired of the defendant concerning its safety, immediately consulted his regular law firm, a representative of which thereupon interviewed the defendant and obtained from him all his records with respect to all the investments which he had recommended to Cooke, including the records pertaining to the plaintiff's loans to Moynagh. Cooke conferred with the law firm concerning those investments and was told that the defendant was not competent to render investment services. Shortly thereafter, two representatives of the law firm instructed the defendant to refrain from any further activity with respect to any of the plaintiff's investments without the firm's prior permission.[2] Those instructions were reiterated in early 1969.

In July of 1969 the defendant learned that the mortgage supposedly securing the $35,000 loan to Moynagh had only then been recorded and that no title search had been done in connection therewith. Such a search would have revealed the fact that Moynagh had conveyed out his interest in the real estate in question in May of 1968, approximately four months after the $35,000 loan was made. In 1970 or 1971 the WRA completed its taking of the real estate, and the plaintiff discharged the mortgage which had been recorded in 1969. The net amount Moynagh received from the WRA was only $18,000, no part of which was ever paid to the plaintiff.

In early 1970 the defendant learned from Moynagh that Overmeyer, which he knew had been making payments directly to Moynagh on the notes which supposedly secured the $57,000 loan, had begun to resist payment of those notes and that litigation with respect thereto was likely to ensue. The defendant did not advise either Cooke or the plaintiff's

---

[2] This particular finding is made by us. It is based (a) on the consistent testimony of the defendant throughout his cross examination by the plaintiff (and in response to specific questions put by the judge) and (b) on the failure of both the representatives of the law firm with whom the defendant had dealt (including the one who had originally recommended his employment) to contradict the defendant on this point when they were subsequently called as witnesses for the plaintiff. The plaintiff is represented by a different law firm in this litigation.

law firm of the dispute between Overmeyer and Moynagh because he regarded himself as discharged from any responsibility for the loans to Moynagh by reason of the instructions he had received from the law firm in 1968 and 1969. In point of fact, that dispute was settled, and Overmeyer paid its notes to Moynagh in full during the period between August of 1971 and January of 1972, all without the knowledge of the defendant. The defendant did not learn of the Overmeyer payments until 1975, by which time Moynagh was hopelessly insolvent and Overmeyer was bankrupt.

The defendant continued to provide accounting services to the plaintiff until 1975. He met with Cooke periodically to review the plaintiff's financial situation, and at least annually he prepared unaudited balance sheets and profit and loss statements for the plaintiff. The two outstanding loans to Moynagh were reflected in the financial statements, as was the fact that payments were not being received on the loans; but as the defendant believed that the loans would be repaid, he gave no indication in the statements that they were of doubtful collectibility. The defendant had also prepared annual financial statements for Moynagh for the years 1966 through 1971, during which Moynagh's business appeared to be prosperous. The condition of that business deteriorated sharply during 1972. During the summer of 1973 (several months after he had completed and submitted the plaintiff's financial statements for the fiscal year 1972) the defendant, while engaged in the preparation of Moynagh's financial statements for calendar 1972, learned facts from which he should have concluded that unsecured obligations of Moynagh might not be collectible. Nothing learned was reflected in any of the financial statements subsequently submitted to the plaintiff. Events which came to the attention of the defendant in 1974 furnished ample additional evidence of Moynagh's financial plight. In 1975 Moynagh filed a voluntary petition in bankruptcy. The present action was commenced several months later.

Further facts, or the absence thereof, will appear at later points in this opinion.

1. The principal question in this case is whether some or all of the plaintiff's claims were barred by the applicable statutes of limitations, as pleaded by the defendants in their answer to the amended complaint on which the case was tried. The judge made no express finding on this question,[3] but we are obliged to consider it because it has been argued by the parties in their briefs before us.

The general rules are that a cause of action in contract accrues at the time of the breach (*Boston Tow Boat Co.* v. *Medford Natl. Bank*, 232 Mass. 38, 41 [1919]; *Campanella & Cardi Constr. Co.* v. *Commonwealth*, 351 Mass. 184, 185 [1966]) and that a cause of action in tort accrues at the time of the injury to the plaintiff (*Cannon* v. *Sears, Roebuck & Co.*, 374 Mass. 739, 740-743 [1978]). However, there are situations in which a cause of action in either contract or tort which is based on an inherently unknowable wrong may not accrue until the person injured knows or in the exercise of reasonable diligence should know the facts giving rise to the cause of action. See, e.g., *Hendrickson* v. *Sears*, 365 Mass. 83, 88-91 (1974); *Friedman* v. *Jablonski*, 371 Mass. 482, 484-487 (1976); *Nantucket* v. *Beinecke*, 379 Mass. 345, 350 (1979). Further, the statute of limitations may be tolled under G. L. c. 260, § 12, if the wrongdoer, either through actual fraud or in breach of a fiduciary duty of full disclosure, keeps from the person injured knowledge of the facts giving rise to a cause of action and the means of acquiring knowledge of such facts. See *Nudd* v. *Hamblin*, 8 Allen 130, 133-134 (1864); *Brackett* v. *Perry*, 201 Mass. 502, 505 (1909); *Stetson* v. *French*, 321 Mass. 195, 196-199 (1947); *Tracerlab, Inc.* v. *Industrial Nucleonics Corp.*, 313 F.2d 97, 101-102 (1st Cir. 1963) (decided under Massachusetts law).

(a) The defendants contend that many of the causes of action alleged by the plaintiff accrued prior to August 5, 1969, and that all claims based thereon were barred by either or

---

[3] The judge's findings for the defendants were based on other grounds which need not be examined.

both of G. L. c. 260, § 2 (six-year limitation on actions of contract), and G. L. c. 260, § 2A, as in effect prior to St. 1973, c. 777, § 1 (two-year limitation on actions of tort).[4] They point specifically to claims arising out of the failures of the defendant Hurwitz: fully to disclose facts bearing on the soundness of the $57,000 and $35,000 loans; properly to investigate the financial conditions of Moynagh and Overmeyer; to obtain assignments of the mortgages that were supposed to secure the Overmeyer notes; to investigate the value and the state of the title to the real estate that was supposed to secure the $35,000 loan; and to obtain adequate legal representation for the plaintiff so that the foregoing errors would have been avoided.[5]  The plaintiff argues that its causes of action did not accrue until 1975 because it neither knew nor should have known of them until that time; it also argues that the statutes of limitations were tolled until 1975 because the defendant concealed the causes of action, either through fraudulent misrepresentations or in breach of his fiduciary duty of full disclosure.[6]

If it be assumed that the plaintiff reasonably relied on the defendant for investment advice and services, the alleged shortcomings in such advice and services would not have been apparent without an unreasonable degree of surveillance by the plaintiff.  Compare *Hendrickson* v. *Sears*, 365 Mass. at 90; *Friedman* v. *Jablonski*, 371 Mass. at 486-487.

---

[4] The present three-year period of limitations applies only to causes of action arising on or after January 1, 1974.  See St. 1973, c. 777, § 4; *Baldassari* v. *Public Fin. Trust*, 369 Mass. 33, 43 (1975).

[5] The amended complaint also contained allegations to the effect that the defendant had committed a breach of his fiduciary duty to the plaintiff in failing to disclose that he was a substantial creditor of Moynagh at the times the loans were made.  We need not recite the evidence in support of those allegations because they are no longer argued.  See Mass.R.A.P. 16(a) (4), as amended, 367 Mass. 921 (1975).

[6] The parties have not discussed which statute of limitations might have been applicable to any particular claim.  Our resolution of this aspect of the case does not require us to decide any such question.  Compare *Hendrickson* v. *Sears*, 365 Mass. 83, 85-86 (1974); *McStowe* v. *Bornstein*, 377 Mass. 804, 809 n.5 (1979).

However, any reasonable reliance on the defendant for investment advice or services must be taken to have ended not later than early 1969,[7] when the representatives of the plaintiff's law firm reiterated their instruction to the defendant to refrain from any further activity with respect to the plaintiff's investments without the firm's prior permission. See Restatement (Second) of Agency §§ 118 and 119 (1957). The firm had taken all the defendant's records with respect to the Moynagh loans in early 1968 and had told Cooke at that time that the defendant was not competent to render investment advice. The details of the loans, including the fact that at least one of them was in default, had been disclosed to Cooke and the firm. In the circumstances, the plaintiff had reason to inquire as to the soundness of the loans and ready access to information evidencing the defendant's alleged failures with respect thereto. It was readily apparent from the documents available to the plaintiff and the law firm that there had been no assignment of any of the mortgages that were supposed to have secured the Overmeyer notes;[8] minimal inquiry would have disclosed that Overmeyer had not been notified of the assignment of those notes; and the infirmities in the security for the $35,000 loan would have been discoverable from public records. We conclude that in the exercise of reasonable diligence the plaintiff should have known by early 1969 at the latest the facts giving rise to the foregoing causes of action.

In the absence of a fiduciary duty of full disclosure, the period of limitations was not tolled under G. L. c. 260, § 12, unless the defendant concealed the existence of a cause of action through some affirmative act done with intent to deceive. *Stetson* v. *French*, 321 Mass. at 198, and cases cited. The judge found that until the summer of 1973 the defendant knew no more about the doubtful collectibility of

---

[7] It will be remembered that the present action was not brought until August 5, 1975.

[8] Cooke had access to the safe deposit box in which the defendant had placed all the documents pertaining to the $57,000 loan.

the loans than the plaintiff did. There is no evidence that the defendant affirmatively or intentionally concealed the cursory nature of his investigation into the financial affairs of Moynagh and Overmeyer or any of the shortcomings in his handling of the loan transactions. If we assume for purposes of decision that there was a fiduciary relationship between the parties when the loans were made (see *Markell* v. *Sidney B. Pfeifer Foundation, Inc.*, 9 Mass. App. Ct. 412, 442 [1980], and cases cited), any such relationship with respect to investment activities ended at the latest in early 1969, when Cooke's distrust of the defendant's competence resulted in the law firm's reiteration of the instructions already referred to. Contrast *Stuck* v. *Schumm*, 290 Mass. 159, 164-166 (1935).

We conclude that no cause of action in contract or tort arising out of the investment advice and service rendered by the defendant prior to the summer of 1969 was saved under G. L. c. 260, § 12, and that each such cause was barred by G. L. c. 260, §§ 2 and 2A.

(b) We now turn to the question whether certain other claims sounding in tort were barred by the two-year period of limitations found in G. L. c. 260, § 2A, as then in effect. The plaintiff contends that the defendant was negligent in failing to inform it or its law firm that Overmeyer was resisting payment of its notes and that litigation with respect thereto was likely to ensue; that the defendant, upon learning that no title search had been done on the real estate which was supposed to have secured the $35,000 loan, should have undertaken to obtain such a search; and that the defendant should also have undertaken to protect the plaintiff's interests when that real estate was finally taken by the WRA.

In asserting these claims the plaintiff had the benefit of the usual rule that a cause of action in tort does not accrue until the plaintiff sustains some injury as the result of a wrongful act on the part of the defendant. See *Sullivan* v. *Old Colony St. Ry.*, 200 Mass. 303, 307-308 (1908); *Cannon* v. *Sears, Roebuck & Co.*, 374 Mass. at 740-743. Converse-

ly, the plaintiff had the burden of proving that the injuries complained of were sustained by it during the applicable period of limitations. *Breen* v. *Burns*, 280 Mass. 222, 228 (1932). *Murphy* v. *Kelley*, 302 Mass. 390, 391 (1939). *Pike* v. *Proctor*, 303 Mass. 535, 536 (1939). *Friedman* v. *Jablonski*, 371 Mass. at 487.

We are thus led to an inquiry as to when the plaintiff's losses were sustained. On this question the judge found only that the collectibility of the $57,000 note had become "doubtful" by the summer of 1973 and that the defendant should have known by some time in 1974 that the "$35,000 note was of doubtful value because at that time he knew about Moynagh's financial difficulties and he did not think the note was properly secured." The available evidence is much more explicit. The last of the Overmeyer notes securing Moynagh's note for $57,000 was paid off in January of 1972; the WRA settled its liability for the taking of the real estate which was supposed to have been security for the $35,000 note some time in 1970 or 1971; and the last complete financial statements for Moynagh's principal business disclose that it had a $63,322.46 net operating loss during the year ending December 31, 1972, and a net worth of only $268.70 on that date.

We conclude that the plaintiff failed to sustain its burden of proving that any of the losses complained of was suffered during but not before the two-year period immediately preceding the commencement of the present action on August 5, 1975. On the record, there is no more basis for invoking the provisions of G. L. c. 260, § 12, with respect to the claims considered in this part of our opinion than there was with respect to the claims considered in part (a) hereof. Accordingly, we hold that all claims set out in this part were barred by G. L. c. 260, § 2A.

2. The plaintiff also asserts a claim in the nature of accounting malpractice which is grounded principally on the contentions that the defendant should have discovered during the course of preparing Moynagh's financial statements for the calendar year 1971 that Overmeyer was paying its

notes directly to Moynagh and that the defendant should have reflected the doubtful collectibility of the $57,000 loan on the financial statements he subsequently submitted to the plaintiff. To the extent this claim sounds in tort, it is subject to all the infirmities discussed in part 1(b) hereof. To the extent the claim sounds in contract (see the cases cited in note 6, *supra*), it suffers from the disabilities that Moynagh's financial statements for the calendar year 1971 were not prepared until December of 1972 and that the next financial statements for the plaintiff were not due or prepared until December of 1973. As already pointed out, all the evidence points to the fact that the $57,000 note had already become worthless by the time when, the plaintiff says, the defendant committed a breach of his implied promise to report relevant facts. In short, there has been no proof of damages resulting from any such breach.

3. Finally, the plaintiff asserts a claim under G. L. c. 93A, § 11, arising out of the defendant's failure to disclose Moynagh's deteriorating financial condition and his representing to the plaintiff that the loans were collectible. The judge found that the defendant made "no intentional or negligent misrepresentation at a time when the plaintiff probably [c]ould have collected on the notes if the plaintiff had accurately understood Moynagh's financial condition." That finding was amply supported by the evidence summarized in part 1(b) hereof. General Laws c. 93A, § 11, inserted by St. 1972, c. 614, § 2, and as subsequently amended, has always been explicit on the point that a plaintiff proceeding under that section must show that he has suffered a "loss of money or property . . . as a result of the use or employment by another person . . . of . . . an unfair or deceptive act or practice." *Frank J. Linhares Co.* v. *Reliance Ins. Co.*, 4 Mass. App. Ct. 617, 620-621 (1976) (1976). Compare *Baldassari* v. *Public Fin. Trust*, 369 Mass. 33, 44-46 (1975) (decided under G. L. c. 93A, § 9[1], as amended

through St. 1971, c. 241). Here again there was a failure of proof.[9]

*Judgment affirmed.*

---

[9] This conclusion renders it unnecessary for us to consider whether the claim under G. L. c. 93A, § 11, was also barred by G. L. c. 260, § 2A. See *Baldassari* v. *Public Fin. Trust*, 369 Mass. at 42-43.