Garsh, J.
INTRODUCTION
Boston Safe Deposit and Trust Company (“Boston Safe”), the plaintiff, acting in its capacity as Trustee of the Charles A. Wheeler Trust (“Wheeler Family Trust”), brings claims against the defendant Ralph H. Seifert (“Seifert”) for breach of fiduciary duty and tortious non-disclosure. The complaint alleges that, as Trustee of the Bristol-Norfolk Development Trust (“BND Trust”), Seifert improperly profited from self-dealing transactions at the expense of the Wheeler Family Trust, a beneficiary of the BND Trust. Seifert moved for summary judgment, claiming that the plaintiffs causes of action against him are barred by the statute of limitations. Boston Safe filed a cross-motion for summary judgment as to liability. For the reasons set forth below, the defendant’s motion for summary judgment is DENIED, and the plaintiffs cross-motion for summary judgment as to liability is ALLOWED.
BACKGROUND
The following material facts are not disputed:
In 1963, Seifert and Charles A. Wheeler (“Wheeler”) placed approximately 85 acres of undeveloped real estate in Foxboro and Mansfield into a trust called the *7 BND Trust. They signed under seal a trust instrument in which they appointed themselves as co-trustees, naming Boston Safe as successor co-trustee upon the death, resignation, or mental incapacity of either of them. The trust instrument granted the trustees very broad powers and discretion with respect to the trust property, including the power to buy and sell, maintain, and develop the property. During the lifetime of the donors and the survivor of them, the net income of the trust was to be divided into two equal parts. The first part was to be paid to Wheeler during his lifetime and, on his death, into the Wheeler Family Trust, a trust he had designated in favor of his family. The second part was to be paid to Seifert during his lifetime and, on his death, into a trust he had designated in favor of his family (“Seifert Family Trust”). The BND Trust was to terminate on the death of both Seifert and Wheeler, whereupon both the Wheeler and Seifert Family Trusts would receive an undivided one-half interest in the trust corpus. The trust document contained a spendthrift provision, prohibiting anticipation or assignment of trust principal or income by any of the beneficiaries.
In June 1977, Wheeler died, and Boston Safe succeeded him as co-trustee of the BND Trust. The last lot sale by the trust closed shortly after Wheeler’s death. Though prior to Wheeler’s death, the trustees had profitably sold gravel from the BND Trust property to a third party, beginning in or about 1980, the Town of Foxboro prohibited that practice. Boston Safe, informed by Seifert’s projections that the BND Trust property would yield little short-term future income, contemplated selling it. Starting in 1978, Boston Safe conducted several appraisals, both internally and through contract, of the trust property. R.M. Bradley & Co., Inc. (“R.M. Bradley”), an appraisal firm, determined that the trust property was most suitable for residential subdivision development. Seifert laid out the subdivision plan on which R.M. Bradley’s hypothetical subdivision analysis was based.
In 1982, Seifert expressed to Boston Safe his belief that the depressed real estate market, zoning problems, water recharge area, and wet land classification issues would not lead to a sale of the BND Trust property then “and perhaps the long run as well.” In that year, Seifert made three separate offers to purchase the Wheeler Family Trust’s interest in the BND Trust property. Boston Safe rejected all three offers. Seifert was aware that Attleboro Savings Bank considered the BND Trust property the “premier” development opportunity in the bank’s marketing area.
In the summer of 1983, Paul J. Folkman (“Folk-man”), a real estate developer in the Mansfield and Foxboro area, and Seifert’s son, Mitchel Seifert, incorporated Folkman Company, Inc. (“Folkman Company”), a real estate development company. Folkman was the president and Mitchel Seifert was the treasurer of Folkman Company. In April, 1984, Folkman and Mitchel Seifert walked the BND property to consider its capacity for development. In July of 1984, Folkman Company employed an aerial photographer to create contour maps of the BND Trust property. Seifert, without notice to Boston Safe, allowed Folk-man to review the BND Trust file and provided him and Mitchel Seifert with a copy of both the 1980 R.M. Bradley $100,000 appraisal and a September 1984 $500,000 estimate of the market value of the BND Trust property made, at Seifert’s request, by a local real estate company. In addition, Seifert shared with them his own analysis of the potential development of the BND Trust property.
On September 5, 1984, using Seifert’s development analysis, Folkman and Mitchel Seifert drafted an offer on behalf of Folkman Company to acquire from the Trustees of the BND Trust 100 percent of the BND Trust property for approximately $140,000. Seifert knew about Folkman’s interest, but did not inform Boston Safe.[3] The letter itself was never mailed to the Trustees. Seifert believed in September of 1994 that $500,000 represented a fair value for the property. A letter dated March 25, 1985 from Folkman Company sought financing from Attleboro Savings Bank for the purposes of acquiring and developing the BND Trust property and for making mortgage payments to Ralph Seifert. A copy of that letter was sent to Seifert. Boston Safe was not informed.
On June 14, 1985, having himself revised Folkman Company’s September 5th proposal so that it offered to acquire only the Wheeler Family Trust’s one-half interest in the BND Trust property instead of the ‘Trust’s land holdings,” Seifert forwarded to Boston Safe a proposal by Folkman Company, dated June 12, 1985, to acquire the Wheeler Family Trust’s half-interest in the BND Trust property for $79,000, plus a $21,000-value assumption of the mortgage.[4] Seifert derived the figure offered by Folkman in June of 1985 by beginning with a total value of $200,000. At that time, Seifert was not interested in selling his own half of the trust property and, in fact, planned to develop the property with the Folkman Company had it acquired the Wheeler Family Trust’s interest in the property. He did not, however, tell Folkman that he was not interested in selling his portion of the land. Seifert made no effort whatsoever to maximize the value of the Folkman Company’s offer for the Wheeler Family Trust’s interest in the property. Boston Safe rejected Folkman Company’s proposal.
In November of 1985, R.M. Bradley prepared an updated appraisal that set the value of the property at $600,000. The result was shared with Seifert, who agreed that the property had increased in value to $600,000. Boston Safe did not explore selling the trust property to third parties because Seifert consistently stated that he did not wish to sell his interest to a third party.
*8 On March 27, 1986, Seifert offered to purchase the Wheeler Family Trust’s interest in the BND Trust property for approximately $200,000. Prior to that date, Seifert had concluded that Boston Safe would sell him the Wheeler Family Trust’s half-interest in the BND Trust properly. Seifert testified in his deposition, “[w]hen [a Boston Safe representative] called me in September [ 1985] and told me that the bank had made a decision in July [1985] to sell me the land and they were going to have an appraisal done, it became evident that I was going to be the purchaser.” He consequently felt that he had the right to maximize his anticipated profit on the resale or development of the property. Seifert believed that he was free of any responsibility to the beneficiaries of the BND Trust, and that belief was predicated on Boston Safe’s informing him that it intended to have the BND property appraised in connection with determining a price for selling the Wheeler Family Trust’s interest to Seifert. Seifert did not inform Boston Safe of his negotiations with Folkman respecting the BND Trust property because he believed that he was conducting these discussions on his own behalf and not in his capacity as Trustee of the BND Trust.
Nothing in the record supports an inference that Boston Safe was prepared to sell to Seifert, or that Seifert reasonably believed that Boston Safe would sell to Seifert, regardless of the amount of any third pariy’s offer to purchase the trust property. Nothing in the record supports an inference that Boston Safe was prepared to sell to Seifert, or that Seifert reasonably believed that Boston Safe would sell to Seifert, so that Seifert could turn around and immediately resell the property to a buyer ready, willing, and able to buy the entire property at a price far in excess of twice what Seifert was offering for half of the property. Nothing in the record supports an inference that Boston Safe was prepared to sell to Seifert, or that Seifert reasonably believed that Boston Safe would sell to Seifert, regardless of Seifert’s intention with respect to resale of the property. Nothing in the record supports an inference that Boston Safe was prepared to breach its fiduciary duty to the Wheeler Family Trust in order to ensure a sale to Seifert, or that Seifert reasonably believed that Boston Safe would be prepared to breach its fiduciary duty to enable Seifert to become the purchaser.
At Seifert’s request, in the week preceding March 31, 1986, Folkman Company submitted a March 31, 1986 proposal to Seifert outlining its interest in acquiring the property for development purposes and Folkman’s discussions with outside parties concerning the plans and financing for the development project. On May 5, 1986, Seifert and Boston Safe held a meeting during which they reached an understanding, subject to approval by Boston Safe’s Trust Administrative Committee, that Seifert would purchase the Wheeler Family Trust’s interest in the BND Trust property for approximately $283,000, contingent upon the Probate Court’s allowance of his petition to dissolve the BND Trust.[5] At no time before, during, or after this meeting, did Seifert make Boston Safe aware of the contents of Folkman’s March 31,1986 proposal. By letter to Seifert dated May 13, 1986, Boston Safe confirmed the May 5th oral understanding, noting that its terms were subject to modification upon advice of Boston Safe’s counsel. The record contains no evidence that Boston Safe had any reason to believe that Seifert would have consented to a sale of his interest in the BND Trust property to a third person.
After the May 5, 1986 meeting, Seifert’s contacts with Boston Safe dwindled. All further communications between Seifert and Boston Safe were conducted through their respective counsel. Counsel for Seifert did not inform counsel for Boston Safe that, simultaneously with the negotiation of a purchase and sale agreement between Seifert and Boston Safe, he was negotiating a purchase and sale agreement between Seifert and Folkman.
Late in July, 1986, Seifert petitioned the Probate and Family Court for dissolution of the BND Trust. By July 23, 1986, Folkman had offered Seifert one million dollars for the BND Trust property. The purchase price was a term and condition for sale of the property communicated by Seifert to Folkman. Seifert determined that the property was worth that much based, in part, on his belief that an existing road in an adjoining subdivision could be connected to a subdivision in the BND Trust property, resulting in greater value per lot than had been estimated by R.M. Bradley. Seifert did not disclose to Boston Safe Folkman’s offer to purchase the entire BND property for one million dollars, Seifert’s interest in selling the entire property, or any of his doubts as to R.M. Bradley’s assumptions. Seifert also did not share with Boston Safe his belief that the trust property had been rapidly increasing in value throughout 1985 and 1986.
In August 1986, Folkman offered Seifert one million dollars in cash for the property. This offer was not disclosed to Boston Safe. On September 18, 1986, Seifert signed a formal agreement, individually and as trustee of the BND Trust, spelling out the terms of the sale to Seifert of the Wheeler Family Trust’s interest for approximately $283,000.[6] Six days later, on September 23,1986, before Boston Safe had executed that agreement, Seifert and Folkman Company entered into a purchase and sale agreement for the sale from Seifert to Folkman Company of substantially all of the BND Trust property for $1.2 million,[7] contingent on Seifert’s obtaining title to the entire trust property. Again, Seifert failed to disclose the existence of this agreement to Boston Safe.
On October 1, 1986, oblivious of the September 23, 1986 purchase and sale agreement with Folkman, a trust officer for Boston Safe executed the September 18, 1986 agreement. As the dissolution of the BND Trust was a condition precedent to the sale to Seifert of the Wheeler Family Trust’s interest in the BND *9 Trust, the agreement required Boston Safe to consent to the petition to be filed by Seifert to dissolve the BND Trust. The affirmative “assent” language was specifically negotiated by Seifert’s counsel because he felt it would better “accomplish the purpose at hand.” The draft prepared by Boston Safe simply had said that Boston Safe would “not appear and object” to the dissolution. Seifert’s counsel did not disclose to Boston Safe that Seifert planned to sell the property to Folkman.
In petitioning the Probate & Family Court to dissolve the BND Trust, Seifert represented that accomplishment of the purposes of the BND Trust required, inter alia, a close personal relationship with Boston Safe that was lacking. One purpose of the BND Trust, namely sale of the property, could have been accomplished without an ongoing working relationship between Seifert and Boston Safe. Seifert also represented to the Court that accomplishment of the purposes of the BND Trust required, inter alia, payment by the beneficiaries of expenses to hold and develop the Trust Property. The BND Trust could have sold its property to Folkman without incurring significant development expenses. Seifert also represented to the court that “no good reason now exists for continuation of the Trust.” When that statement was made, but for Seifert’s purchase and sale agreement with Folkman, the Trust could have sold the property to Folkman for $1.2 million, netting significant income to the trust for distribution equally to both beneficiaries. On November 20, 1986, the Probate & Family Court for Bristol County, unadvised as to the existence of the September 23, 1986 purchase and sale agreement, entered a judgment dissolving the BND Trust. On December 30, 1986, three deeds changed hands: the BND Trust transferred its property to the Wheeler Family Trust and to Seifert as tenants in common; the Wheeler Family Trust conveyed its half of the interest in the BND Trust property to Seifert for approximately $283,000; and, unbeknownst to Boston Safe, Seifert conveyed substantially all of the BND Trust property to Folkman[8] for $1.2 million. The deed evidencing the transfer of the property from Seifert to Folkman was recorded in the Registry of Deeds in both Bristol and Norfolk Counties on December 31, 1986.
Sometime in 1990, while handling a tax matter for the Wheeler Family Trust, Boston Safe sent a paralegal or title-searcher to the Registry of Deeds to retrieve a copy of the date-stamped 1986 deed for the Seifert/Wheeler Family Trust transaction. In the course of doing so, that person inadvertently discovered the deed evidencing the immediate subsequent transfer of the trust property from Seifert to Folkman and brought its existence to Boston Safe’s attention. Boston Safe commenced this action on December 7, 1992.
DISCUSSION
Breach of Fiduciary Duty/Tortious Non-Disclosure
Basic principles of trust law govern the outcome of this case. A trustee owes a duty of loyalty to all of the beneficiaries to administer the trust solely in the beneficiaries’ interest. Restatement (Second) of Trusts §170(1) (1959). See Boston Safe Deposit and Trust Co. v. Lewis, 317 Mass. 137, 140 (1944) (Trustee “must lay aside self-interest when it becomes adverse to the rights of the cestuis que trust, for the office of trustee cannot be subverted to fostering the personal advantage of individual gain of the incumbent. . . There can be no divided loyalty”); Ball v. Hopkins, 268 Mass. 260, 266 (1929); Johnson v. Witkowski, 30 Mass.App.Ct. 697, 706 (“The rule that a fiduciary may not derive personal advantage at the expense of the trust, nor put himself in a position antagonistic to the beneficiaries of the trust, will be strictly enforced”), rev. denied, 411 Mass. 1104 (1991). Where trust property is sold to one of the trustees, the transaction is subject to intense scrutiny, for the trustee’s duty as a fiduciary to the beneficiary almost inevitably conflicts with the adversarial relationship that necessarily arises between buyer and seller. “The beneficiary is entitled to be protected against the self-interest that prompts any person to sell for the highest price obtainable and to buy for the lowest price possible.” Terry v. Terry, 305 Mass. 113, 115 (1940) (and cases cited therein).
Trust law so cautions against a trustee’s purchase of trust property in his individual capacity that in cases where a trustee is accused of conducting a self-interested transaction, that trustee carries the burden both to show good faith and to show that the challenged transaction was advantageous to the trust and its beneficiaries. Johnson, 30 Mass.App.Ct. at 706. “Like Caesar’s wife, the trustee must be above suspicion. When the trustee yields to those temptations, it is not long before rationalizing takes over and the interest of the beneficiaries are compromised.” Loring: ATrustee’s Handbook, §6.1.3, at 121 (7th ed. rev., Charles E. Rounds, Jr. & Eric P. Hayes 1994).
Where a trustee fails to disclose material facts to a beneficiary, that trustee has breached his fiduciary duly of disclosure even if he has acted in good faith. Akin v. Warner, 318 Mass. 669, 675 (1945).
A trustee, unless authorized by the trust instrument or by decree of court, or unless he has the consent of all beneficiaries, if they are of age and competent to decide and are fully informed of all the details of the transaction, which in fact must be fair and reasonable, cannot act in a dual capacity as a seller of trust property to himself or as purchaser for the trust of his own property . . . Personal gains accruing to a trustee from the transfer of trust property to himself must be accounted for by him even though he was acting in good faith, unless the *10 beneficiaries knew the nature and effect of the transfer . . .
Boston Safe, 317 Mass. at 140 (emphasis supplied). See also Hill v. Hall, 191 Mass. 253, 263 (1906); Restatement (Second) of Trusts §170(2) (1959). Failure to disclose when there is a duty to disclose is equivalent to an affirmative misrepresentation. Puritan Medical Center, Inc. v. Cashman, 413 Mass. 167, 176 (1992); Restatement (Second) of Torts §551 (1977). “[A] fiduciary’s silence is equivalent to a stranger’s lie.” Energy Resources Corp., Inc. v. Porter, 14 Mass.App.Ct. 296, 304 (1982) (Brown, J., concurring).
The disclosure required must be complete. In the words of Justice Cardozo, “[i]f dual interests are to be served, the disclosure to be effective must lay bare the truth without ambiguity or reservation, in all its stark significance.” Wendt v. Fischer, 243 N.Y. 439, 443 (1926).
The undisputed facts demonstrate that Seifert’s conduct fell far short of what was required of a fiduciary. He did not make full disclosure of numerous material facts when he had a duty to do so[9] and Boston Safe relied, to its detriment, on these non-disclosures. Further, Seifert acted for his personal benefit in violation of his fiduciary duties in negotiating and entering into an agreement with Folkman solely for the benefit of himself. In sum, the record demonstrates that Seifert has no reasonable expectation of proving any set of facts that could counter the factual demonstration Boston Safe has made that Seifert breached his fiduciary duties and engaged in tortious non-disclosures.
Acting “Out of Trust”
Seifert argues that trust principles should not govern his dealings with the trust property because, by the time Seifert bought the trust property in 1986, any fiduciary relationship he had had with the Wheeler Family Trust had long since been terminated by the parties’ conduct.[10] He alleges that the parties, in short, acted “out of trust” before they formally dissolved the trust in November, 1986.
In support of that argument, Seifert relies upon Naukeag Inn, Inc. v. Rideout, 351 Mass. 353 (1966). In that case, shareholders of half the stock of a close corporation executed a broad general release of liability when acquiring the remaining half of the stock owned by the other shareholders. Id. at 355. The parties conducted the sale of the land and termination of the business relationship at arm’s length. Id. at 357. When, several months after the sale, the buyers brought suit against the sellers for misrepresentations concerning the property’s condition, the court held that a verdict for the sellers had been properly directed because “(t]he fiduciary relationship, if any still persisted, was to end simultaneously with the delivery of the releases.” Id. at 357.
In an effort to parallel the facts in Naukeag with the facts of the case at bar, Seifert points to Boston Safe’s and the Wheeler’s distrust of Seifert. As proof of such distrust, Seifert offers a Boston Safe trust officer’s March 14, 1979 file memorandum concerning the Wheeler Family Trust’s inclination to sell the land: “Wheelers don’t trust [Seifert], need money.” Boston Safe, Seifert further argues, treated him at arm’s length in an effort to maximize the profit from the sale of the Wheeler’s interest. Boston Safe trust officers, for example, at the advice of Boston Safe’s own “Fiduciary Expert’s Group” counsel, were initially unwilling to share the appraisals of the trust property with Seifert because of his position as buyer. One trust officer perceived her duty as being to obtain the “highest price available” from the sale of the trust property. Seifert also points to his decreased communication with Boston Safe subsequent to May 5, 1986, the date of his oral understanding with Boston Safe to purchase the Wheeler Family Trust’s interest in the trust property.
These facts do not tend to show a lack of “continuing confidence” in Seifert by Boston Safe vis-a-vis Seifert’s obligations as trustee. Boston Safe, itself, had a fiduciary duty to procure the highest price possible. Ball, 268 Mass. at 266. In order to comply with its fiduciary duty, Boston Safe needed to bargain with the purchaser, and such bargaining necessitates an arm’s length stance. Boston Safe never would have had to assume such a position had Seifert not expressed an interest in purchasing the trust property for himself. In other words, had Seifert disclosed Folkman Company’s interest in purchasing the entire property, there is nothing in the record to support the proposition that Boston Safe would have had an arms length relationship with Seifert in their joint negotiations with that third party on behalf of the BND Trust.
Furthermore, in contrast to Naukeag, there are no general releases discharging Seifert from an otherwise inalienable duty of loyalty that a trustee owes to its beneficiaries. Seifert points to nothing in the record that constitutes an act or conduct, or facts giving rise to an inference of an act or conduct, amounting to an affirmative severance of the trustee-beneficiary relationship. Compare Frank Cooke, Inc. v. Hurwitz, 10 Mass.App.Ct. 99, 109 (1980) (fiduciary relationship ended when fiduciary is asked to cease duties) with Stuck v. Schumm, 290 Mass. 159, 164-66 (1935) (trust relationship continues in the absence of formal repudiation of relationship). “[W]here a relationship of confidence is once established, either some positive act or some complete case of abandonment must be sh[o]wn in order to determine it.” Hill, 191 Mass. at 266, quoting Rhodes v. Bate, 1 L.R. 252, 260 (Ch.App. 1865). There is no evidence that any statements were made that constituted an oral repudiation of the trust relationship. An oral repudiation “must be open, definite and brought to the attention of the person who has the right to institute proceedings (against the repudiating trustee).” Stuck, 290 Mass. at 164.
*11 As the fiduciary relationship between the parties was never severed, Seifert’s fiduciary duties continued until November 20, 1986, the date of the formal dissolution of the BND Trust. Seifert breached his fiduciary duty to his beneficiaries by not informing them of Folkman’s interest in purchasing the entire BND Trust property and by formulating a “side deal” with Folkman that promised to generate an enormous profit for Seifert at the expense of the beneficiary Wheeler Family Trust. The same result obtains if the date of the formal dissolution of the BND Trust is deemed to be October 1, 1986, when Boston Safe executed the agreement to transfer the Wheeler Family Trust’s interest in the BND Trust to Seifert, or even if it is deemed to be May 5, 1986, when the oral understanding between Seifert and Boston Trust was reached. Following the May 5, 1986 meeting, but prior to the execution of any formal contract, Seifert was discussing selling the entire trust property to Folkman Company for one million dollars. Further, there is abundant evidence of breach of Seifert’s fiduciary duty before May 5, 1986 by virtue of his failure to disclose Folkman Company’s active interest in, communications regarding, and even financial preparations in anticipation of its purchase of the BND Trust property.
Patrick v. Bowman, 149 U.S. 411 (1893), also relied upon by Seifert, does not require the denial of Boston Safe’s motion for summary judgment. Apart from the fact that it does not control Massachusetts common law of fiduciary duties, in that case, the Supreme Court held that where, as between partners, there is an understanding as to the terms and conditions of the sale of one partner’s interest to another partner, the purchasing partner has no duty to inform the other of a subsequently-learned material fact affecting the sale price of the shares. Id. at 426. The Court noted that a duty to inform does exist if negotiations are open at the time that the purchasing partner becomes aware of the material fact. Id. Here, the undisputed facts demonstrate that negotiations were open at the time that Seifert failed to disclose material facts.
Seifert, despite his status as purchaser and his procurement of the beneficiary’s consent to the sale of the trust property, owed a duty of full disclosure and a duly not to induce the sale by taking advantage of his beneficiary. Malden Trust Co. v. Brooks, 291 Mass. 273, 286 (1935); Coates v. Lunt, 210 Mass. 314, 318 (1911).
Wearing more than one hat — here, at least three— requires a fiduciary to be very nimble as well as most prudent. While the fiduciary may purport to wear one hat at a particular moment, in truth, all hats are worn together at all times.
Johnson, 30 Mass.App.Ct. at 704. The information Seifert failed to disclose unquestionably was material to the BND Trust. Indeed, the undisclosed information would have indicated that the trust property had so increased in value that a sale to Seifert was not in the best interest of all the beneficiaries. The trust had the same opportunity to sell the entire property to Folk-man as Seifert individually had. Seifert arrogated unto himself that trust opportunity.
It was the clearest and plainest breach of duty on the part of the Defendant that, when he was acting for [his beneficiary], as he ought to have been, he should endeavor to obtain a private advantage for himself and conceal that from the Plaintiff as he did.
Dunne v. English, 18 L.R. 524, 538 (Eq. 1874).
Creation of Trust Relationship
As an alternative to the argument that the trust relationship had ended before the sale to Folkman, Seifert argues that there never was a trust relationship and, therefore, he never owed any fiduciary duties to the Wheeler Family Trust. There is no evidence in the record that Seifert and Wheeler formed a partnership rather than a trust, and the record demonstrates that Seifert has no reasonable expectation of proving any set of facts in support of his assertion that no trust ever existed. See Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Although Seifert can testify that he considered the BND Trust a partnership, “[i]t is what the parties did in making the trust indenture that is decisive.” Williams v. Milton, 215 Mass. 1, 12 (1913). Only if the ultimate control of the affairs of a company lies in the shareholders, and not in the directors or trustees, may it be inferred that the relationship created is in the nature of a partnership, and not a trust. E.g., First National Bank v. Chartier, 305 Mass. 316, 321 (1940) (no formal trust deed or agreement of partnership); Frost v. Thompson, 219 Mass. 360, 365 (1914); Williams, 215 Mass. at 10.
The BND Trust instrument grants significant powers of management and control to the trustees, not to its beneficiaries. By the terms of the trust, the property is to be held by the trustees to pay income to the beneficiaries. There are no transferable shares. By its express terms, the BND Trust contains a spendthrift provision. There is no provision for any meeting of the beneficiaries. The beneficiaries can consent to alteration or termination of the trust, but they cannot force the trustees to take any act. Even with respect to matters such as termination, alteration or amendment of the trust, there is no provision for a meeting of the beneficiaries to be held. When the BND Trust was formed, Seifert was 35 years old and Wheeler was 72. The instrument creating the trust clearly contemplated that the entity created would continue even if one of the donors no longer had any active involvement, providing that “[i]n the event of the death, resignation, or mental incapacitation of one of the Donors as Trustee, the Boston Safe & Deposit Company, of Boston, Massachusetts shall take his place as succeeding Trustee, and on the death, resignation, or mental incapacity of both Donors as Trustee, shall be the sole Trustee hereunder.” “It is plain that it is a trust and not a partnership . . . The sole right of the *12 cestuis que trust is to have the property administered in their interest by the trustees, who are the masters, to receive income while the trust lasts, and their share of the corpus when the trust comes to an end.” Williams, 215 Mass. at 10-11.
In any event, Seifert is estopped to deny the existence of a trust relationship between the parties by his representations made in the Probate Court proceeding. In that action, Seifert acknowledged in his Complaint and, in fact, sought to dissolve, the very relationship he now claims never existed, stating, “ [t]he Bristol Norfolk Development Trust is an inter-vivos trust established by a declaration of trust dated January 2, 1963 . . .” The present proceeding concerns the same relationship and the same parties. “Judicial estoppel, or ‘preclusion of inconsistent positions,’ is an equitable doctrine which precludes a party from asserting a position in one legal proceeding which is contrary to a position it has already asserted in another.” Fay v. Federal Nat’l Mortgage Ass’n, 419 Mass. 782, 787 (1995). That doctrine is applied where a party has successfully asserted his or her inconsistent position in a previous proceeding. Id. By virtue of the fact that Seifert secured judicial approval to dissolution of the trust, he successfully asserted his position in that case that there was a trust to be terminated.
Seifert also is bound by the admissions in his answer filed in this action that the BND Trust was, in fact, a trust and that he was a trustee bound by fiduciary duties to his beneficiary. See G.L.c. 231, §87; Zaleski v. Zaleski, 330 Mass. 132, 134 (1953).
Statute of Limitations
Seifert argues that Boston Safe’s claims against him are barred, as a matter of law, by the three-year statute of limitations applicable to tort claims. G.L.c. 260, §2A. Boston Safe counters that, under the discovery rule, its causes of action did not accrue until the deed to Folkman was inadvertently found in 1990 and that, alternatively, G.L.c. 260, §12, the fraudulent concealment statute, tolled the statue of limitations in its favor.
Traditionally, a cause of action in tort was deemed to accrue at the time of the injury to the plaintiff. Frank Cooke, Inc. v. Hurwitz, 10 Mass.App.Ct. 99, 106 (1980), citing Cannon v. Sears, Roebuck & Co., 374 Mass. 739, 740-43 (1978). More recently, in the absence of a governing statute, the discovery rule has been applied in a host of situations to determine when the statute of limitations starts to run. Under the discovery rule, a plaintiffs cause of action accrues when the plaintiff knows or in the exercise of reasonable diligence should have known that he has been harmed or may have been harmed by the defendant’s conduct. Bowen v. Eli Lilly & Co., 408 Mass. 204, 205-06 (1990). The discovery rule was developed in recognition of “the unfairness of a rule that holds that the statute of limitations has run even before a plaintiff knew or reasonably should have known that [he] may have been harmed by the conduct of another.” Id. at 205.
The discovery rule has been applied to psychother-apeutic malpractice, Riley v. Presnell, 409 Mass. 239, 243 (1991); medical malpractice, Franklin v. Albert, 381 Mass. 611, 618-19 (1980); real estate fraud, Friedman v. Jablonski, 371 Mass. 482, 485-86 (1976); legal malpractice, Hendrickson v. Sears, 365 Mass. 83, 83-84 (1974); incestuous child abuse, Phinney v. Morgan, 39 Mass.App.Ct. 202, 204 (1995); and misrepresentation, McEneaney v. Chestnut Hill Realty Corp., 38 Mass.App.Ct. 573, 577 (1995). Fundamental fairness dictates that it be applied not simply to a cause of action based upon affirmative misrepresentations, but also to a cause of action for breach of fiduciary duty arising out of secret usurpation of a trust opportunity and to non-disclosures under circumstances where there is a duly to disclose. Indeed, the Court recognized in Hendrickson that the discovery rule concept was not particularly radical because the Court already had “in a variety of circumstances held that a cause of action accrues on the happening of an event likely to put the plaintiff on notice.” Hendrickson, 365 Mass. at 89, citing Akin v. Warner, 318 Mass. 669, 676 (1945) (claim against trustee). See also Attorney General v. Trustees of Boston Elevated Railway Co., 319 Mass. 642, 669-70 (1946) (proceeding brought to make good improper expenditures by trustee not barred by statute of limitations if, after beneficiary knows or should have known of breach, action is brought within the time period prescribed by the statute); Robertson v. Hirsh, 276 Mass. 452, 454 (1931) (where trustee reaped secret profit at expense of beneficiary, statute of limitations does not bar recovery if beneficiary was “ignorant of the secret profit”); Greenfield Savings Bank v. Abercrombie, 211 Mass. 252, 259 (1912) (in action by bank for trustee’s improper loans, statute of limitations does not begin to run until beneficiary has “learned of the trustee’s wrongdoing or of his practical repudiation of the trust and of the duties thereby”).
Seifert maintains that the discovery rule is inapplicable because the recorded deed to Folkman was a public document, and thus, Boston Safe’s claim was not “inherently unknowable.” The mere filing of a deed, however, in the absence of any reason whatsoever for a beneficiary to have checked to see if such a deed existed, is not dispositive. To be “inherently unknowable” for purposes of the discovery rule, a wrong need not be incapable of detection, but only “incapable of detection by the wronged party through the exercise of reasonable diligence.” International Mobiles Corp. v. Corroon & Black/ Fairfield & Ellis, Inc., 29 Mass.App.Ct. 215, 222 (1990). In Hendrickson, the attorney’s malpractice was as discoverable as Seifert’s non-disclosures because the malpractice involved the overlooking of an easement of record. Yet the Court held that the cause of action did not accrue until the clients discovered or should reasonably have discov *13 ered the attorney’s misrepresentation concerning the record title. 365 Mass. at 90 (client cannot be expected to “watch over professional,” given that “relation of attorney and client is highly fiduciary in its nature”).[11] Friedman v. Jablonski, supra, does not, as Seifert argues, support the proposition that the determinative factor is whether the plaintiff had the means to discover that he was injured. That case involved a misrepresentation by a seller to a buyer concerning the existence of a right of way over other property. Unlike Hendrickson, it did not involve a fiduciary relationship. Friedman, 371 Mass. at 485. In the context of a buyer dealing at arm’s length with a seller, the court found that there was a duty of reasonable inquiry and that, had the plaintiffs conducted a title search, employing an attorney acting on their behalf, they would have discovered that there was no right of way recorded in the Registry of Deeds. The plaintiffs, held the court, “must take the consequences of any failure to do so or of any omission on the part of their attorney.” Id. 358. The court explicitly rejected the argument made here by Seifert:
We stress that we are not saying that an action for deceit does not lie because the plaintiffs should have inquired at the registry of deeds. An action for deceit is not barred as matter of law because the victim could have ascertained the falsity of the representation by an examination of title in the registry of deeds . . . What we are saying is that in the circumstances existing between these parties the cause of action for deceit accrued at least by the date the plaintiffs took title to the premises.
Id. at 485, n. 4 (citations omitted). Here, in contrast to Friedman, there is a fiduciary relationship, and, in the absence of any reason to be suspicious, Boston Safe was under no obligation to make an inquiry. The simple fact that the trust was dissolved by order of the court, upon consent induced by material non-disclosures, does not trigger a duly of inquiry with respect to everything a trustee may have done or not have done during the tenure of the trust. Of course, had something happened to trigger a duly of reasonable inquiry, the fact that such an inquiry would have disclosed the deed would preclude Boston Safe from arguing that it could not reasonably have discovered the non-disclosure.[12] Boston Safe here argues not that it was prevented from discovering the deed, but only that it was under no obligation to check to see whether such a deed existed.
In sum, because Boston Safe has demonstrated that it did not know and should not have known that the beneficiaries of the trust had been harmed by Seifert’s breach of his fiduciary duties, under the discovery rule, the statute of limitations for the plaintiffs claims did not begin to run until Boston Safe’s inadvertent discovery of the deed in 1990.[13] This action was filed within three years of that discovery.
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendant’s motion for summary judgment is DENIED, and that the plaintiffs motion for summary judgment as to liability on Counts I and II is ALLOWED.

Seifert also did not advise the Wheeler family directly about any of the matters about which he failed to advise Boston Safe.

At some time between 1984 and 1985, Folkman purchased Mitchel Seifert’s stock in Folkman Company, and he became the sole owner of that company.

The parties agreed that the spendthrift provision in the trust instrument prevented the trustees from selling the Wheeler Family Trust’s interest in the trust property without first dissolving the trust. Cf. Restatement (Second) of Trusts §343, comment (1959).

Less adjustments for certain payments made by Seifert on behalf of the Wheeler Family Trust.

The agreement stated that “title to the premises is currently held by the Bristol-Norfolk Development Trust of which SELLER is a beneficiary.”

The deed lists the grantee of the property as Paul J. Folkman, not Folkman Company.

The non-disclosures extended to the Probate & Family Court as well. Seifert’s counsel, as an officer of the court, was under a duty to bring material facts to the attention of that court if silence was likely to result in an erroneous decision by the court. In re Neitlich, 413 Mass. 416, 423 (1992). Failure to comply with that ethical obligation may constitute fraud upon the court.

 At the least, he claims, the issue of whether a fiduciary relationship did, in fact, exist at the time of the sale is a question for the jury, not for summary judgment. However, because the material facts are undisputed, whether a fiduciary relationship existed is a matter of law.

 Similarly, even though a patient has the right to take his x-rays and bring them to a second doctor to be reviewed, it cannot be said of a patient who does not do so that, as a matter of law, he reasonably should have learned of the harm to him which occurred as soon as he was misdiagnosed. Cf. Franklin, 381 Mass. at 620.

Walker v. Soule, 138 Mass. 570, 572 (1885) (no fraudulent concealment where representation could be verified by review of public records).

Because the court has found that that statute of limitations did not begin to run until discovery of the deed, it is not necessary to reach Boston Safe’s independent argument that G.L.c. 260, §12, the fraudulent concealment statute, tolled the statute of limitations even after the trust was dissolved.