**TRACERLAB, INC., Plaintiff, Appellant,**

v.

**INDUSTRIAL NUCLEONICS CORPORA-
TION, Defendant, Appellee.**

**No. 6055.**

United States Court of Appeals
First Circuit.

Feb. 4, 1963.

Norman A. Hubley, Boston, Mass., H. Lawrence Tafe, III, John A. Lahive, Jr., Herrick, Smith, Donald, Farley & Ketchum and Weingarten, Orenbuch, & Pandiscio, Boston, Mass., on the brief, for appellant.

James D. St. Clair, Boston, Mass., Blair L. Perry and Hale & Dorr, Boston, Mass., on the brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the District of Massachusetts granting defendant's motion for summary judgment in an action in which plaintiff alleged the misappropriation of trade secret information in connection with the construction of radioactive measuring devices known as "beta gauges" and in the issuance of a patent embracing these products.

Plaintiff-appellant is a Massachusetts corporation principally engaged in the research, development and manufacture of a diversified line of nucleonic equipment for industrial application, including industrial control apparatus for measuring radioactive elements.

Defendant-appellee is an Ohio corporation which also produces similar apparatus.

Plaintiff alleges that in 1949 it hired one Chope and one Foster to do research work; that in the course of their work they learned many of plaintiff's confidential and valuable trade secrets; that in 1950 both Chope and Foster left the employ of plaintiff and proceeded almost immediately to establish the defendant corporation. Thereafter, according to plaintiff, they illegally utilized the secret information which had been gleaned during the course of their employment with the plaintiff and proceeded to develop and market the products which form the general basis of this action.

The district court in acting on defendant's motion for summary judgment, accepted as true the facts alleged by plaintiff but granted the motion on the grounds that the action was foreclosed by the Massachusetts statute of limitations and by the doctrine of laches. The correctness of the trial judge's rulings on each of these grounds presents the principal issues on this appeal.

In Massachusetts,[1] the applicable period of limitations is two years. Mass. G.L. Ch. 260, § 2A. However, in an appropriate case, the two year period may be extended by § 12 of the above cited chapter which provides:

"§ 12. Extension of Time in Case of Fraudulent Concealment.

"If a person liable to a personal action fraudulently conceals the cause of such action from the *knowledge* of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action." (Emphasis supplied.)

Defendant contends that whatever cause of action the plaintiff may have had arose in the 1950–52 time period—the time during which defendant was incorporated and first began producing radioactive measuring devices or "beta gauges." Consequently, in defendant's view, plaintiff's suit which was commenced on July 9, 1958 was clearly outside the two year Massachusetts limitations period.

On the other hand, plaintiff contends that its cause of action did not accrue until April 1, 1958—the day on which a patent was issued to defendant incorporating principles bottomed on plaintiff's trade secrets. Until that day plaintiff claims that it lacked the "knowledge" of its cause of action within the purview of § 12—owing to defendant's fraudulent acts of concealment—and that it thereupon acted seasonably upon acquiring that knowledge.

The trial judge rejected this contention and after reviewing the depositions of three of plaintiff's officers—which together with an affidavit of Chope, the president of the defendant corporation, and the pleadings furnish the sole evidence on the present state of the record—held that:

"In this case, on the admission of plaintiff's own principal officers, [plaintiff] had knowledge of the alleged misappropriation of their trade secrets as early as 1950."

In answer to plaintiff's argument that while it early "suspected" that defendant had in fact misappropriated its secrets —this suspicion did not rise to the statutory level of "knowledge"—the court replied:

"This was not, as [plaintiff] argues, mere suspicion, but rather a firm belief that defendant was using their trade secrets, a belief strong enough to lead them to take at least some steps toward bringing suit."

---

1. Both parties concede that the law of Massachusetts applies here.

This appeal, coming to us after the trial judge's grant of a motion for summary judgment, gives rise to the familiar principle that: "* * * a reviewing court must view the evidence in the light most favorable to the party against whom the motion has been granted, according that party the full benefits of all favorable inferences that may be drawn from the evidence in determining whether there exists a genuine issue of material fact." Atlas v. Eastern Air Lines, Inc., et al., 311 F.2d 156 (1st Cir., 1962), and cases cited therein.

Applying this principle, the question is whether the record discloses a genuine issue of material fact as to whether the plaintiff had knowledge or the means of acquiring knowledge as to its cause of action at some point prior to April 1, 1958—the date on which defendant was issued its patent.[2]

Preliminarily, it will be helpful to be more specific with reference to plaintiff's "cause of action." The record indicates that a "beta gauge" is an exceedingly intricate and complex electronic instrument. The machine itself is a vertical console which stands some six feet high and which has recorders built into the unit. In the words of the complaint "A typical beta guage has a gap between the source and the detector so that as a material in sheet form, the thickness of which is to be measured, is passed through the gap the amount of radiation passing through the material to the detector varies according to the weight per unit area of the material. Variations in the amount of radiations passing through the material are measured by the detector unit and expressed on the recording device."

The particular trade secrets which the defendant corporation assertedly plagiarized did not, however, relate to the external configuration or design of the machine but rather to its highly complex and internal circuitry. Thus, again in the words of the complaint, plaintiff deemed it essential to develop "an automatic periodic standardization system to compensate for variables other than the weight of the material being measured. * * * To compensate for these variables plaintiff developed a measuring circuit means for comparing from time to time the intensity of radiations whose intensity is a function of the quantity being measured with radiations of a standard intensity."

It is the alleged pirating of the trade secrets relating to the above-described circuitry, inter alia, which is the cause of action—knowledge of which plaintiff must be charged—if summary judgment for the defendant was providently granted.

As noted above, the trial judge's finding of knowledge was predicated upon the depositions of certain officers of plaintiff and consequently an examination of those depositions is in order.

After analyzing the deposition of William E. Barbour, Jr., president of the plaintiff, the trial judge concluded: "Thus Barbour, the President of plaintiff from 1946 to 1955, testified that he knew Chope and Foster knew plaintiff's secrets and that they had left to go into the business of producing beta gauges and that within a year after they left he knew they were putting out a competitive product, that he then felt the design of plaintiff's beta gauge had been plagiarized from Tracerlab." It is obvious that even the trial judge's summary of Barbour's testimony apparently recognized the distinction between what Barbour "knew" and that concerning which he had a "feeling."

There is no question but that Barbour (and the plaintiff) was aware from the beginning that Chope and Foster knew plaintiff's trade secrets. All of plaintiff's secret information had been fully and freely made available to them in the course of their employment while they were employees of the plaintiff. Knowledge of these secrets was essential to the performance of their work. Similarly, there is no question that Barbour

---

2. The application for the patent was filed May 5, 1952.

(and the plaintiff) was well aware from the very outset that Chope and Foster had gone into the "beta gauge" field and were producing a competitive product. However, all of this is a far different thing from having knowledge that the defendant had misappropriated and was using the self-same intricate electronic circuit details which were the plaintiff's trade secrets and which underlie the present cause of action. As to this specific misappropriation, even the trial judge seemed to recognize that Barbour only "felt" it was true.

Moreover, further analysis of Barbour's deposition shows that his "feeling" was based almost entirely on suspicion, conjecture and rumor. Upon examination by defendant's counsel, Barbour stated that while he had instructed his salesmen to attempt to secure information on the defendant's machine—the salesmen's efforts failed to unearth any tangible information.

"Q. Did you undertake any further investigation, such as sending persons out to look at and examine the machines sold by them? A. Yes, we made an effort through our sales department to ascertain where, when, what, how, they were doing.

"Q. How successful were these efforts? A. They weren't successful.

"Q. In any respect? A. Not factually, they were successful in that we got more rumors they were making gauges and had sold some gauges, but these were strictly rumors, to my knowledge. * * * "

When queried on the subject of plaintiff's knowledge that the defendant's machine incorporated an automatic withdrawal standarization (a feature embraced by plaintiff's circuitry secrets), Barbour stated that: "I believe that rumor came back to us but it was strictly a rumor." The speculativeness of the "rumor" was then made more explicit in the ensuing colloquy:

"Q. Did you, at any time, learn anything that would discredit the accuracy of that rumor? A. Yes, it wasn't a real sound rumor, it was a pretty hazy one.

"Q. Did you learn that was the type of machine they initially constructed and offered to the trade? A. Did I learn it?

"Q. Yes. A. No, I didn't learn it, I guessed it."

In short, a fair reading of Barbour's entire deposition indicates that while he did indeed have a "feeling" that the defendant had plagiarized the plaintiff's designs, it was a feeling based on the gossamer threads of speculation, suspicion and surmise. Knowledge—in the sense of an awareness of concrete facts— was conspicuously absent.

So, too, with the depositions of the other two officers of plaintiff, vice president Myers and that of William H. Faulkner, a former vice-president. While the testimony was clear that they had formed an "opinion" that the defendant had plagiarized certain of the plaintiff's trade secrets, this again was largely an assumption which lacked any real basis in knowledge. This assumption apparently derived essentially from the fact, again, that Chope and Foster had worked for plaintiff, had learned certain trade secrets in the course of their employment and then, almost immediately, incorporated a competing business in the same field. In Myers' words: "One could draw no firm conclusions. One could only presume. * * * However, there was no basis to support this opinion in fact." Faulkner's opinion in turn was based essentially on "general talk" and "suspicion."

We believe that a careful examination of the depositions of plaintiff's three officers compels a conclusion that, at the very least, there exists a genuine issue of material fact as to whether the plaintiff had knowledge of any specific, tangible or concrete facts which would indicate to it that the defendant was using its trade secrets in the defendant's beta gauges.

Assuming then that there exists a genuine issue of material fact as to whether the plaintiff had the requisite knowledge of defendant's misappropriation of its secrets, the next question is whether the means for acquiring this knowledge were available to plaintiff prior to the issuance of the defendant's patent.

Again, a reading of the plaintiff's complaint makes it clear that the only facts, knowledge of which would have formed a reasonable basis for bringing action against the defendant, were facts which would have shed some light on the involved, highly complex and entirely internal circuitry of the defendant's gauge.

This circuitry was located inside defendant's machine behind a locked steel door. While plaintiff had continually instructed its salesmen to attempt to acquire information on defendant's circuitry, nowhere in the depositions is there any evidence that plaintiff's personnel had ever observed the inner workings of the machine. There was evidence that on at least two occasions representatives of plaintiff had requested permission to open and observe the internal operations of beta gauges which were in operation in the plants of defendant's customers. On these occasions, the customer indicated that defendant had told them not to allow such observation.

Indeed, the trial judge found as fact that: "It appears also from the testimony of these officials that none of them prior to 1958 had seen any of the plans of defendant's beta gauge or had examined the inside of the device so as to see how it was constructed and how it worked. They had made numerous efforts to do so but had been unsuccessful."

Thus, while there is abundant evidence that employees of plaintiff had frequently seen defendant's machine in operation and observed its external operations, the only information which could legitimately serve as the basis of any knowledge of plagiarism was information which lay deeply enmeshed in the internal circuitry of the defendant's gauge—and on the trial judge's own finding—plaintiff's efforts to garner this information were unavailing. Consequently, we believe that at the very least, there exists a genuine issue of material fact as to whether the plaintiff had available the means of acquiring the relevant knowledge prior to the issuance of defendant's patent.

In reaching his decision, the trial judge cited several cases. However, in each of them the extent of the plaintiff's knowledge or the complexity of the subject matter which was the subject of that knowledge was far different from the situation here. Compare, Nudd v. Hamblin, 90 Mass. 130 (1864); Brackett v. Perry, 8 Allen (201 Mass.) 502, 87 N.E. 903 (1909). In the Nudd case the suit involved an action for illegally cutting trees on a parcel of land belonging to plaintiff. There, in a suit commenced twelve years after the alleged trespass, the court denied the plaintiff's attempt to avoid the statute of limitations on the ground of concealment and noted that the plaintiff lived only three miles from the property in question and that a private road led to it.

The comparison between the availability of knowledge in the Nudd case, where the plaintiff by a cursory glance at her property could have informed herself of the cause of action, and the situation in the present case, is obvious. Here the testimony of the plaintiff's officers not only disclosed a complete lack of knowledge but an inability to obtain it.

In the Brackett case there was no issue as to plaintiffs' having knowledge of the facts on which the cause of action was subsequently based. There the plaintiffs had been directly informed of the entire facts which constituted their cause of action, yet failed to act.

In contrast, here the plaintiff not only lacked direct knowledge of the facts constituting its cause of action but was unsuccessful despite repeated efforts to obtain those facts.

Again, in Sanborn v. Gale, 162 Mass. 412, 38 N.E. 710, 26 L.R.A. 864 (1894),

also cited by the district judge, there was no question of the personal knowledge of the plaintiff for he had himself directly observed his wife and the defendant in the act of adultery which was the subsequent basis for an action against the defendant for alienation of affection. There, after holding that the concealment statute did not extend the statute of limitations, the court stated: "A cause of action cannot be said to be concealed from one who has a personal knowledge of the facts which create it, although he may have no other means of establishing his case than by his own testimony." Id., at p. 414, 38 N.E. at p. 710.

■ The "personal knowledge" in Sanborn v. Gale must be compared with the present case where the plaintiff's officers repeatedly testified that plaintiff did not know any facts and had only "rumor," "suspicion," "guesses" and "surmises." If suspicion, surmise, opinion and conjecture are sufficient to take the case out of the extension of time provision of § 12, then the action of the trial judge would surely be proper. However, our reading of the cases makes it plain that the Massachusetts court does not equate suspicion with knowledge, but is explicit in requiring actual knowledge, or, as an equivalent, "[f]ull means of detecting the fraud." See, Brackett v. Perry, supra, 201 Mass. at 505, 87 N.E. at 904, Nudd v. Hamblin, supra, 90 Mass., at 133; Farnam v. Brooks, 9 Pick. (26 Mass.) 212, 245 (1830). And as we have indicated above, here there surely exists a genuine issue of material fact as to whether plaintiff had available to it the "full means" of acquiring knowledge.

Moreover, we cannot ignore the fact that the statute itself uses the unqualified word "knowledge" in setting forth the prescribed state of a plaintiff's perception of the pertinent facts. Suspicion and knowledge are poles apart on a continuum of understanding. As has been stated in a different context: "Suspicion differs from knowledge in that one who has knowledge of a fact has no substantial doubts as to its existence, whereas one may have suspicions although he realizes that there is a substantial chance of its non-existence." Restatement of Restitution, § 10, Comment D.

■ In the present case we believe that there does exist a genuine issue of material fact as to whether the plaintiff had the requisite knowledge of his cause of action or the "full means" of obtaining it, and consequently we believe that the district judge erred in holding that the suit was barred by the statute of limitations.

The finding by the trial judge that the plaintiff had knowledge or the means of obtaining knowledge of the defendant's alleged misappropriation also served as his basis for the application of the doctrine of laches. Thus, the court stated: "As has already been pointed out, plaintiff knew of the existence of its cause of action and had available the means of discovering the additional facts needed to prove its case. * * * Plaintiff should have brought its action promptly when it knew its rights were being violated."

■ Invocation of the doctrine of laches requires not only the passage of time but an acquiescence—either express or implied—in the alleged wrong. Hawkes v. First National Bank of Greenfield, 264 Mass. 538, 544, 163 N.E. 246 (1928). Since acquiescence must be predicated on knowledge—again, either express or implied—and since we disagree with the trial judge's conclusion as to this factor, we find laches to be no bar at this stage of the proceeding. See Polaroid Corp. v. Polarad Electronics Corp., D.C., 23 F.R.D. 182 (1959); Hershey Chocolate Corp. v. Hershey Beverage Corp., D.C., 17 F.R.D. 89 (1954).

Our disposition of the issue of summary judgment makes it unnecessary for us to decide other issues raised by the parties at this time.

A judgment will be entered reversing the judgment of the district court and remanding the case to that court for further proceedings. not inconsistent with this opinion.