Brassard, J.
Introduction
Plaintiffs filed this eleven-count complaint on October 9, 1998, seeking relief in the form of rescission of insurance policies and a refund of all premiums paid, actual and treble damages, and a judgment declaring that plaintiffs’ May 1998 rejection of the insurance policies was valid.
Plaintiff Wilson Farm, Inc. (“Wilson Farm”) is a farming business owned and operated by members of the Wilson Family. Donald Wilson (“Donald”) is the Treasurer, co-General Manager and 34% owner of Wilson Farm. He has also served on the boards of several other companies. His cousin, Alan Wilson (“Alan”), is also an executive and 34% owner of Wilson Farm. Their wives and sons are also employees of Wilson Farm, and the sons own the remaining shares of the business. (Donald, Alan, their spouses, and sons are collectively referred to as the “Wilson Family” herein.)
Plaintiff William Cutter (“Cutter”) is the trustee of four trusts created by the Wilson Family, and is the nominal owner of the subject insurance policies. The trusts are the beneficiaries of these policies. Cutter worked as an accountant for Wilson Farm from 1949 until 1993. The subject policies were purchased before his retirement, but he has continued to act as trustee for them ever since.
Defendant Richard Gleason (“Gleason”) is an insurance agent who sold the subject policies as an agent of defendant Berkshire Life Insurance Company (“Berkshire”). Neither defendant has contended that Berkshire is not liable for the actions of Gleason in this case.
Defendants have moved for summary judgment on all counts of the complaint. For the reasons set forth below, this motion is ALLOWED as to Counts I, II, IE, IV and X and DENIED as to Counts V, VI, VII, IX, and XI. The motion is ALLOWED IN PART and DENIED IN PART as to Count VIE. The Court declares and enters judgment that plaintiffs did not validly reject the Berkshire Policies on May 20,1998, that the Berkshire Policies are not void ab initio, and that the plaintiffs are not entitled to a refund of all premiums paid on the Berkshire Policies.
Background
The following facts are taken from the summary judgment record, including the depositions and affidavits, and are summarized in a light most favorable to plaintiffs.
This dispute arises from the sale of insurance policies in 1989 and 1990. The Wilson Family was concerned about tax issues related to their estates, in the event that Donald, Alan or their wives, Betty and Carolyn (collectively the “Senior Wilsons”), died.
Donald had an ongoing business relationship with Gleason, as Gleason was the trustee for a Wilson Farm profit-sharing plan (“the Plan”). Gleason and Donald first met in 1987 to discuss the concerns that Donald had with the cost of insurance policies owned by the Plan, taken on the lives of Wilson Farm employees. These policies were issued by The New England Life Insurance Company (these policies wiU hereafter be referred to as the “New England Policies”). Gleason recommended that the Plan cease to pay for these policies, but that each employee be given the opportunity to purchase his or her poficy from the Plan. On Gleason’s recommendations, the Senior Wilsons purchased their New England Policies from the Plan in order to keep them in effect. Thereafter, Gleason and his associate, Margaret Goulet (“Goulet”), remained involved in the administration of the Plan and continued to meet with Donald every four to six weeks.
In 1989, while meeting about the administration of the Plan, Cutter mentioned the Wilson Family’s estate tax concerns to Gleason. Gleason prepared an analysis of the Wilson Family’s tax needs and then met with Donald to recommend that the Senior Wilsons purchase additional life insurance policies from Berkshire (the “Berkshire Policies”), the benefits of which would be used to pay estate taxes. Donald agreed that life insurance policies would be an appropriate tool for estate planning, but was concerned about how much money he would be paying each year for the policies. Donald claims that he wanted the premiums to remain at the same cost each year. Gleason claims that Donald only wanted the out-of-pocket costs for the Berkshire Policies to remain level.
The Berkshire Policies that Gleason eventuaUy sold to Cutter, on behaIf of the four trusts, had premiums that increased each year. However, Gleason set up a system in which the cash values of the New England Policies, other Senior Wilson life insurance policies from Guardian Life Insurance Company (“Guardian Policies”), and later the Berkshire Policies themselves, were borrowed against and appHed towards the cost of the premiums of the Berkshire Policies, thus keeping the out-of-pocket expenses level. Donald claims he never knew that the cash values would be used to keep the amount paid each year level, and maintains that he was told that the actual premiums would remain level each year. The death benefits of the policies were $1,500,000 each for Donald and Alan, and $300,000 for each of their wives.
The Senior Wilsons created four trusts to own the Berkshire Policies. Before the policies, could be issued, the Senior Wilsons had to sign applications. Gleason and Goulet cofiected information from the Senior Wil *425 sons and Cutter and prepared the applications for them. These applications are labeled “Flex 15,” but do not state that the premiums would increase. The Senior Wilsons signed the applications and Gleason and Goulet arranged for them to be processed. In January and February of 1990 Berkshire issued the Berkshire Policies.
For varying reasons, the Berkshire Policies required amendments. When a policy requires amendment, the policyholder is required to sign the amendment. Gleason and Goulet took the amendments to Wilson Farm for the Senior Wilsons to sign. Gleason and Goulet testified that at the time the Senior Wilsons signed these amendments, the policies were attached. None of the Senior Wilsons remembers whether the policies were attached or not. Donald, Alan and their wives each testified that he or she simply signed what each was told to sign, without reading the papers. By the fall of 1990 all of the Berkshire Policies had been issued and all amendments signed.
Goulet claims that after the amendments were signed she sent a binder, containing all of the Berkshire Policies, to Cutter. The Senior Wilsons and Cutter claim that neither Cutter nor any of the Senior Wilsons received the Berkshire Policies at that time. Cutter and the Senior Wilsons claim to have never seen or read the Berkshire Policies until May of 1998. The Berkshire Policies clearly indicate increasing premiums for each year up to year sixteen. Page one of each policy states that the premiums will increase, and also contains a schedule demonstrating this increase.
Each year Donald, on behalf of Wilson Farm, received bills from Berkshire for the premiums.[1] Each bill showed the premium due and the Berkshire dividend which was used to offset a portion of the premium. Each year Donald personally caused Wilson Farm to pay these bills. He also received annual checks from loans against the cash values of the New England Policies and the Guardian Policies, which he deposited into Wilson Farm accounts. Every year Donald and Cutter each received annual statements from Gleason showing the premiums and cash values on all of the Berkshire Policies. Donald also received and reviewed annual statements from Gleason showing the cash value in each of the New England Policies. Gleason reviewed these statements with Donald annually.
Soon after the issuance of the Berkshire Policies, Donald noticed that the premiums were increasing and that he was paying more each year. However, these amounts were very small at first, and did not raise a “red flag” with him. The total amount paid for the premiums on the four Senior Wilsons’ policies increased from $66,580 to $76,951, or about 16%, from the first year to the second year. From the second year to the third year, they increased from $76,951 to $85,882, or roughly 12%. From the third year to the fourth year the increase was from $85,882 to $95,533, or roughly 11%. From the fourth year to the fifth year the increase was from $95,533 to $104,914, or roughly 10%. The premiums continued to increase by about $9,500 per year through 1998, although the percentage at which they increased declined.[2]
Donald did not complain about these increases to Gleason at first, but he did voice his concerns to Gleason beginning in the spring of either 1994 or 1995, although the record is unclear on when this first happened. Donald testified that he told Gleason that he was very concerned about the increasing premiums, and that they were not what he expected. On one occasion, in response to Donald’s concerns, Gleason allegedly replied, “Well that happened to be this year. It will straighten itself out.” The next year, when Donald again raised concerns, Gleason said “it’s because of the interest, one thing or the other.” Donald further testified that on one occasion Gleason said, “I hear what you are saying,” but that nothing was ever done about this. In 1996, Donald again raised his concerns with Gleason, but Gleason did not have any comment.
In April of 1998, after meeting with an attorney to develop estate planning devices, Donald called Goulet and asked to see a copy of the Berkshire Policies. Goulet and Gleason delivered copies to Cutter on May 12, 1998. The Senior Wilsons and Cutter claim that this was the first time they ever received copies of the Berkshire Policies. Counsel for the plaintiffs returned the Berkshire Policies to Gleason on May 20, 1998, pursuant to a ten-day “free look” clause in the policies, along with a letter demanding a refund of all premiums paid up to that point in time. The ten-day “free look” clause in the Berkshire Policies allows the policyholders to return their policies to Berkshire within ten days of receiving them. If the policyholders return the policies within this time, they are entitled to a refund of all premiums paid and the policies are treated as if they had never existed. Berkshire thereafter denied the plaintiffs’ and Senior Wilsons’ request for refunds claiming that the policies had previously been delivered in either 1989 or 1990, that Wilson Farm had been paying the premiums, and that the Wilson Family, through the trusts, had been accepting the insurance coverage for eight years.
Plaintiffs have alleged eleven counts in their complaint. Count I (Declaratory Relief) of the plaintiffs’ complaint seeks a judgment declaring that plaintiffs validly rejected the Berkshire Policies on May 20, 1998, that the Berkshire Policies are void ab initio and the plaintiffs are entitled to a refund of all premiums paid on the Berkshire Policies. Count II (Money Had and Received) alleges that defendants owe the plaintiffs money had and received in the amount of the Berkshire Policy premiums, to be refunded following plaintiffs’ rejection of the policies. Count III (Breach of Contract) alleges that defendants: a) failed to deliver the Berkshire Policies to the plaintiffs in a timely *426 fashion, constituting a material breach of the insurance contract, and b) materially breached the insurance contract by failing and refusing to refund the premiums to the plaintiffs.
Count IV (Unjust Enrichment) alleges that defendants will have been unjustly enriched by the plaintiffs’ premiums, which they have accepted and used for eight years, if the defendants are not required to refund those premiums to the plaintiffs. Count v. (Churning) alleges that defendants engaged in a wrongful replacement of life insurance policies by funding the Berkshire Policies’ premiums with loans against the cash values of the Guardian and New England policies, without disclosing the escalation of the Berkshire Policies’ premiums. Count VI (Estoppel) alleges that plaintiffs changed their position, purchased the Berkshire Policies and paid the premiums on those policies in reliance on defendants’ disclosures or lack of disclosures and the defendants must therefore refund the premiums.
Count VII (Breach of Implied Covenant of Good Faith and Fair Dealing) alleges that defendants schemed and attempted to conceal from the plaintiffs and the Senior Wilsons the escalating premium schedule and caused them to pay higher premiums than the plaintiffs otherwise would have agreed to. Count Vin (Negligence) alleges that defendants were negligent in failing to comply with the regulations governing disclosures when replacing life insurance policies and in failing to deliver the Berkshire Policies to the plaintiffs once they were issued by Berkshire. Count IX (Deceit) alleges that the defendants failed to deliver the Berkshire Policies to the plaintiffs and failed to disclose, or made partial or misleading disclosures about the escalating nature of the Berkshire premiums.
Count X (Conversion) alleges that defendants, by failing and refusing to return the premiums to the plaintiffs, have wrongfully converted the amounts to their own use. Count XI (G.L.c. 93A, Unfair and Deceptive Trade Practices) alleges that defendants made misleading disclosures concerning the premium amounts for the Berkshire Policies, failed to deliver the Berkshire Policies to the plaintiffs for more than seven years, failed and refused to refund the premiums upon demand, and wrongfully replaced existing insurance policies at Wilson Farm without making necessary disclosures. The defendants are seeking summaiy judgment on all counts of the complaint.
Discussion
This court grants summaiy judgment where there are no genuine issues of material fact, and the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass 419, 422 (1983), Mass.R.Civ.P. 56(c) (West 2000). The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. Pederson v. Time, Inc., 404 Mass. 13, 16-17 (1989).
“If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact in order to defeat [the] motion.” Id. The nonmoving party cannot defeat the motion by resting on his or her pleadings, but must offer admissible evidence to support a finding in that party’s favor. LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
Though the plaintiffs included eleven different counts in their complaint, these counts can be divided into three basic claims. The first is for rescission, based on the ten-day “free look” provision. The second claim alleges that defendants made misrepresentations about the Berkshire Policies’ premiums. The third claim is for “churning” of insurance policies.
In their motion for summaiy judgment, defendants argue that plaintiffs’ claims are barred by the applicable statutes of limitation. Where a party moves for summaiy judgment on this basis, the nonmoving party has the burden of demonstrating that it has brought its claims within the necessary period. Shahzade v. Gregory, 930 F.Sup. 673 (D.Mass. 1996).
The Rescission Claim
Plaintiffs are seeking rescission of the insurance policies under the “free look” provision of the Berkshire Policies. This clause reads as follows: “[a]fter receiving the policy, the owner has ten days to review it. The owner may return the policy to us within ten days and we will cancel it. When we receive the policy, we will return any premium that was paid.” Ten-day “inspect or reject” or “free look” clauses are commonly found in life insurance policies and are included in most model policies. See Bertram Harnett, The Law of Life and Health Insurance, Vol. 2, §5.01(1), 5-21 (1988). However, there are few Massachusetts cases that address these clauses.[3]
The parties dispute when the Senior Wilsons or Cutter actually “received" the policies, triggering the ten-day “free look" period. However, this court need not decide that question because the court concludes that regardless of when the “free look” period began or ended, plaintiffs’ claims for rescission have not been brought within a reasonable period of time and are barred by the equitable doctrine of laches.
Laches applies when there has been an unjustified and unreasonable delay in instituting a legal action or claim which delay results in actual harm or prejudice to the defendant. Srebnick v. Lo-Law Transit Mgmt., Inc., 29 Mass.App. 45, 49 (1990); Jubinville v. Jubinville, 313 Mass. 103, 105 (1943). The burden of proving laches rests on the defendant and its existence is a question of fact to be determined by the judge, in consideration of all the circumstances surrounding the delay in bringing suit. Berry v. Nardozzi, 362 Mass. *427 145, 150 (1972); Shea v. Shea, 296 Mass. 143, 147 (1936).
Laches is not determined so much by the delay itself but the delay in conjunction with a plaintiffs lack of diligence in discovering a claim. Holmberg v. Beaumont, 28 F.Sup. 100, 102-03 (1939). This lack of diligence may be viewed as express or implied acquiescence in the defendant’s alleged wrong. Tracerlab, Inc. v. Industrial Nucleonics, 313 F.2d 97 (1st Cir. 1963). If the plaintiff knew of the existence of its cause of action and had available the means of discovering the additional facts needed to prove its case, then the plaintiff should have brought its action promptly when it knew its rights were being violated. Id. at 102. See Hayes v. Penn. Mut. Life Ins. Co., 228 Mass. 122, 124 (1917) (holding that plaintiff, an experienced businessman who failed to read his policy, could not cancel the policy and be refunded the premiums, having paid premiums on the policy for more than twenty-five years). However, if there is no knowledge of the wrong committed and no refusal by the plaintiff to embrace an opportunity to ascertain facts, there can be no defense of laches. Stewart v. Finklestone, 206 Mass. 28, 36 (1910).
The ten-day free look clause is easily understood at a glance due to its wording and location. The Senior Wilsons unreasonably waited eight years to request copies of the Berkshire Policies. They could and should have requested them much earlier when Donald first became concerned about the Berkshire Policies. If the plaintiffs and the Senior Wilsons had exercised appropriate diligence and requested copies of the Berkshire Policies reasonably soon after their concerns arose, laches would have no application. Instead, the failure of the plaintiffs and the Senior Wilsons to request copies or investigate their concerns for at least four years, coupled with continued premium payments, constitutes implied acquiescence. The unreasonableness of the delay is underscored by Donald’s experience in business and with other life insurance policies.
It is also critically significant that Berkshire provided insurance coverage to the Senior Wilsons until 1998. If one of the Senior Wilsons had died during the 1990 to 1998 time period, Berkshire would have been responsible for paying the sizeable death benefit. Berkshire’s potential liability comprised the prejudice caused by the unreasonable delay of the plaintiffs and the Senior Wilsons. See Hayes v. Penn Mut. Life Ins. Co., 228 Mass. 122, 125 (1917); Plympton v. Dunn, 148 Mass. 523, 526 (1889).
For the aforementioned reasons, Count II (Money Had and Received), Count III (Breach of Contract), Count IV (Unjust Enrichment) and Count X (Conversion) are all barred by laches. Count VIII (Negligence, as to the delivery of the Berkshire Policies) is also barred by laches. As to Count I, Declaratory Relief, the court enters the following judgment:
Plaintiffs Wilson Farm Incorporated and William Cutter did not validly reject the Berkshire Policies on May 20, 1998, the Berkshire Policies were not void ab initio, and plaintiffs are not entitled to a refund of all premiums paid on the Berkshire Policies.
The Misrepresentation Claim
Plaintiffs and the Senior Wilsons claim that defendants fraudulently concealed that the policy premiums would increase over the life of the Berkshire Policies. G.L.c. 175, §181 governs claims of misrepresentation in connection with the sale of insurance, and contains a two-year statute of limitations.[4] Defendants have asserted that this claim is barred by the statute of limitations because plaintiffs allege that Gleason made misrepresentations in 1989 and 1990 and they did not file suit until October 9, 1998.
“When a defendant fraudulently conceals a cause of action from the knowledge of a plaintiff, the statute of limitations is tolled under G.L.c. 260, §12, for the period prior to the plaintiffs discovery of the cause of action.” Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 519. To rely upon the fraudulent concealment doctrine, plaintiffs must show that the defendants took an affirmative act of concealment of the cause of action, or that a fiduciary relationship existed between defendants and themselves. Connelly v. Bartlett, 286 Mass. 311, 317-18 (1934). When the defendant is a fiduciary, its failure to disclose the facts that would give rise to knowledge of a cause of action is equivalent to fraudulent concealment for the purposes of applying G.L.c. 260, §12. Demoulas, 424 Mass. at 519.
Plaintiffs and the Senior Wilsons allege that Gleason was a fiduciary and thus had a duty to disclose to them that the premiums were increasing. If plaintiffs can show that Gleason was a fiduciary, they need not prove that defendants engaged in an affirmative act to make a claim for fraudulent concealment. Frank Cooke, Inc. v. Hurwitz, 10 Mass.App.Ct. 99, 106 (1980). If Gleason was a fiduciary, even the fact that plaintiffs had the means to discover that the premiums were increasing does not preclude the statute of limitations from tolling until they acquired actual knowledge that they were increasing. Demoulas, 424 Mass. 501, 519. The “discovery rule,” which requires plaintiffs to exercise reasonable diligence to discover the cause of action, does not apply when the defendant is a fiduciary. Id., at 520. Thus this court must first determine whether or not a reasonable jury could conclude that Gleason was a fiduciary.
“Doubtless, there are many familiar and well recognized forms of fiduciary relationships such as attorney and client, trustee and beneficiary, physician and patient, business partners, promoters or directors and a corporation, and employer and employee.” Warsofsky v. Sherman, 326 Mass. 292 (1950). “The relationship is not confined, however, to these and *428 similar situations for the circumstances which may create a fiduciary relationship are so varied that it would be unwise to attempt the formulation of any comprehensive definition that could be uniformly applied in every case.” Id.
The relationship between an insurance agent and the insured is not normally considered to be fiduciary in nature. Baldwin Crane & Equipment Corp. v. Riley & Riley Ins. Agency, Inc., 44 Mass.App. 29, 31-32 (1997). However, plaintiffs allege that special circumstances in this case created a fiduciary relationship between Gleason and the Senior Wilsons.
Though business transactions conducted at arm’s length generally do not give rise to fiduciary relationships, such a relationship can develop where one party reposes its confidence in another. See, e.g., Warsofsky, 326 Mass. at 292-93. Importantly, however, courts have repeatedly cautioned that “plaintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature.” Superior Glass Co. v. First Bristol County Nat’l Bank, 380 Mass. 829, 832 (1980) (quoting Broomfield v. Kosow, 349 Mass. 749, 755 (1965)). In determining whether such a transformation has taken place, courts look to the defendant’s knowledge of the plaintiff s reliance and consider the prior relation of the parties, the plaintiffs business capacity contrasted with that of the defendant, and the “readiness of the plaintiff to follow the defendant’s guidance in complicated transactions wherein the defendant has specialized knowledge.” Kosow, 349 Mass. at 560.
Whether or not a fiduciary relationship existed is a factual question to be decided by a jury. Patsos, 433 Mass. at 329. At the summary judgment stage, the plaintiff must submit sufficient evidence that a reasonable jury could find that a fiduciary relationship was in existence. Id.
The subject sale of life insurance was certainly a business transaction, but it was not a typical, onetime sale of insurance. Donald and Wilson Farm had a prior relationship with Gleason that extended beyond the purchase and sale of insurance. Their relationship had begun in 1987, when Cutter and Donald sought Gleason’s advice on life insurance issues related to the Plan. They did not initially seek him out for the purchase of life insurance, but rather as a consultant. Thereafter, he continued to work with Wilson Farm, outside of the context of a life insurance agent, and met with Donald every four to six weeks to discuss the Plan. Thereafter, Donald and Gleason met to review annual statements prepared by Gleason in the spring of each year, following Donald’s receipt of the Berkshire Policies’ premium bills.
Donald testified that he depended on Gleason. He signed documents Gleason placed in front of him without question. When Gleason needed other Senior Wilsons to sign documents, they too signed them without reading them. Plaintiffs have produced sufficient evidence that they reposed trust and confidence in Gleason.
Donald was an experienced business person when he purchased the Berkshire Policies. However, the fact that he had previously sought and followed Gleason’s advice on insurance and other financial issues shows that he relied on Gleason’s expertise at times. The Senior Wilsons did not seek him out to buy insurance, rather it was Gleason who suggested that the Senior Wilsons purchase the Berkshire Policies as an estate planning tool. Gleason continued to meet with Donald to go over the annual statements associated with the Berkshire Policies, and also the New England Life Policies and the Guardian Policies. Considered in the light most favorable to the plaintiff, Gleason was aware that the plaintiffs relied on his expertise and advice. A reasonable jury could conclude that plaintiffs’ and the Senior Wilsons’ faith and confidence in Gleason, and his knowledge of their reliance on his guidance, transformed their relationship from one between a typical insurance agent and client into a fiduciary relationship.
Assuming that Gleason was a fiduciary, and that he had a duty to disclose that the premiums were increasing, the statute of limitations tolled until he either disclosed this information, or the plaintiffs discovered it. Patsos, 433 Mass. at 329. There is a factual dispute over whether or not Gleason disclosed, prior to issuance of the policies, that the premiums would increase. However, Gleason did send annual statements that showed the increasing premiums, and Donald testified that he was aware that they were increasing as early as 1994 or 1995. However, plaintiffs and the Senior Wilsons assert that they relied on Gleason’s assurances that the premiums were not increasing. Again assuming that Gleason was a fiduciary, and owed a duty to disclose, any such assurances contradicted the annual statements, and thus a jury might conclude that Gleason’s actions do not amount to a disclosure.
On this record there appear to be factual disputes as to whether or not Gleason was a fiduciary, and if he was, whether he adequately disclosed to the Senior Wilsons and the plaintiffs, that the premiums would increase. There is also a factual dispute as to when the plaintiffs actually discovered the cause of action. As such, summary judgment on plaintiffs’ claims of misrepresentation and fraudulent concealment is not appropriate.[5]
In CountV (Churning) of their complaint, plaintiffs claim that Gleason made misrepresentations concerning the premiums in regard to replacing insurance policies. In Count VI (Estoppel), plaintiffs claim that they relied on Gleason’s misrepresentations to their detriment. In Count VII plaintiffs claim that Gleason breached his implied covenant of good faith and fair dealing by knowingly making misrepresentations. In *429 Count VIII (Negligence), plaintiffs claim that Gleason failed to make adequate disclosures in regards to the Berkshire Policies. In Count IX (Deceit), plaintiffs claim that Gleason knowingly failed to disclose that the premiums would increase, in order to induce the plaintiffs to pay higher premiums. In Count XI, plaintiffs claim that Gleason’s misleading representations constituted unfair and deceptive trade practices under G.L.c. 93A. Because all of these claims include allegations of misrepresentations and/or fraudulent concealment, summary judgment on these claims is DENIED.[6]
Order
For the aforementioned reasons, defendant’s Motion for Summary Judgment is:
ALLOWED as to Counts I (Declaratory Relief), II (Money Had and Received), III (Breach of Contract), IV (Unjust Enrichment), and X (Conversion) in that plaintiffs’ claim for rescission of the life insurance policies is barred by laches.
ALLOWED IN PART as to Count VIII (Negligence), so far as it is related to Defendants’ delivery of the Berkshire Policies. Defendant’s motion for summary judgment is DENIED IN PART as to Count VIII (Negligence), so far as it is related to improper replacement of insurance policies.
DENIED as to Counts v. (Churning), VI (Estoppel), VII (Breach of Implied Covenant of Good Faith and Fair Dealing), IX (Deceit), and XI (Unfair and Deceptive Trade Practices).
The Court declares and enters judgment that plaintiffs did not validly reject the Berkshire Policies on May 20, 1998, that the Berkshire Policies are not void ab initio, and plaintiffs are not entitled to a refund of all premiums paid on the Berkshire Policies.

Though the four trusts maintained true ownership of the Berkshire Policies, the policies were collaterally assigned to Wilson Farm, making Wilson Farm responsible for the premium payments.

Year 5-6: $104,914 to $114,835, roughly 10%; Year 6-7: $114,835 to $124,486, roughly 8%; Year 7-8: $124,486 to $134,137, roughly 8%.

The only Massachusetts case to consider “free look” clauses by name and at length, states that policies cannot be cancelled by the insured after the expiration of the ten-day period. It does not, however, address when such a period begins to run. Nagel v. Provident Mut. Life Ins. Co. of Phila., 51 Mass. App. 763, 768 (2001).

It is the gravamen of the claim that governs the applicability of the statute of limitations. Pagliuca v. Boston, 35 Mass.App.Ct. 820, 823. This is essentially a claim about misrepresentation related to the sale of an insurance policy. As such G.L.c. 175, §181 should apply, and the applicable statute of limitations is two years. See Grande v. PFL Life Ins. Co., 2000 Mass.App.Div. 261, 262 (2000).

There is also a factual dispute as to whether or not Gleason took affirmative acts to conceal the cause of action from the plaintiff. Plaintiffs argue that not sending the policies to the plaintiffs or Senior Wilsons, along with Gleason’s alleged assurances amount to affirmative acts. Defendants contend that they did send the policies to plaintiffs in a timely manner, that Gleason did not make such assurances, that these do not amount to affirmative acts, and that plaintiffs failed to exercise appropriate diligence to discover the cause of action.

The claimed fiduciary relationship with Gleason does not prevent this court from concluding that the unreasonable and prejudicial delay of plaintiffs bars rescission of the life insurance contracts with Berkshire. Wholly apart from any fiduciary relationship with Gleason, plaintiffs and the Senior Wilsons not only received the benefits of the Berkshire Policies for several years, but also could have readily discovered the “free-look” clause. They were not, in any way, prevented from obtaining copies of their policies. Unlike the increasing premiums, the plaintiffs have not claimed that Defendants have fraudulently concealed this cause of action from them, or made any misrepresentations in regard to this clause. On the other hand, Gleason allegedly concealed the increasing premiums from plaintiffs and the Senior Wilsons, and further, allegedly assured them that what they thought they had discovered was not really true.